IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 APR -8 PM 1:56
U.S. ___
___ ___

NORKA GONZALEZ,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )      Case No. CV-99-TMP-2250-S
                                   )
SEALING EQUIPMENT PRODUCTS         )
COMPANY, INC., ("SEPCO"),          )
                                   )
          Defendant.               )

**ENTERED**

APR  8 2002

## MEMORANDUM OPINION

This action is before the court on the motion for summary judgment filed September 14, 2001, by the defendant, Sealing Equipment Products Company, Inc., ("SEPCO"). The motion was supported by a brief and evidentiary submission. Plaintiff Norka Gonzalez responded to the motion by filing a brief in opposition, supported by exhibits, on December 21, 2001. The defendant submitted a reply brief on January 4, 2002. Both parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c). For the reasons set forth herein, the defendant's motion for summary judgment is due to be granted, and the plaintiff's claims are due to be dismissed with prejudice.

39

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

2

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the

3

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all

4

justifiable inferences are to be drawn in his favor. <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference. <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

Viewing the evidence in the light most favorable to the plaintiff, the following undisputed facts are relevant to the instant motion.  Gonzalez, a female Puerto Rican who speaks Spanish, was hired by SEPCO in 1986.  At the time, the company was owned by Jim Wilder, CEO of the company.  Gonzalez was interviewed by Jim Falls and Danny Deshazo.[1]  Deshazo made the job offer to Gonzalez, which she accepted.  She began to work part-time, and her schedule was very flexible.  She worked in SEPCO's Pelham office, and reported directly to Jim Wilder.  Gonzalez was hired as a telemarketer to communicate with SEPCO customers overseas, using her expertise in Spanish to talk with those who did not speak English.  About a year after she was hired, Gonzalez began working

_____

[1]    It is not clear what Falls' position was at the time, but Gonzalez asserts that she understood that Deshazo was to be her supervisor.  In her deposition, she also asserts that she initially was told to report to Falls and that after she told Mr. Wilder that she didn't get along with Falls, she was instructed to report directly to Wilder.  That arrangement continued until Wilder's death in 1996.

5

full-time, but her hours remained flexible.  After about 1989, Gonzalez was permitted to hire a secretary to work with her. Gonzalez and her secretary made up the international sales department, and Gonzalez became manager of international sales.

In July 1996, Jim Wilder died.  His son, Chris Wilder, became CEO.  Jim Wilder's widow, Susan Wilder, became the chairman of the board of directors.  She took an active role in managing SEPCO, but apparently was not in the office as often as Jim Wilder had been. After Mr. Wilder died, Gonzalez began reporting directly to Gary Dodson, general manager.  At some time in 1997 or 1998,[2] SEPCO offices were relocated from Pelham to a new location.  Beginning in mid-1997, Jim Falls became SEPCO's vice president of sales, which required Gonzalez to report to him.  Falls required Gonzalez to work fixed, rather than flexible, hours, and Gonzalez's work schedule became 8:30 a.m. until 5:30 p.m.  Falls remained as Gonzalez's direct supervisor until her termination in 1999.

Throughout her employment at SEPCO, Gonzalez had recurring complaints about the noise level in the office.  At some time before July 1996, Gonzalez complained to Mr. Wilder about the noise level, and he moved her into a separate office at her request.

_____

[2]     Gonzalez testified that the move occurred in 1997. Mrs. Wilder testified that the move occurred in September 1998.

6

After Mr. Wilder's death and SEPCO's relocation, Gonzalez was moved into the large sales room and no longer had her own office.  She complained frequently about the noise level created by the English-speaking sales representatives,[3] who laughed and joked loudly. SEPCO offered to move Gonzalez's desk several feet away from the others, but she refused the offer, insisting that the space would not help and that she needed her own office.

In the instant action, Gonzalez complains of the following incidents which she claims subjected her to a hostile working environment because of her ethnic origin.  At some time before the relocation, Gonzalez was speaking Spanish in the office with another employee.  Don Donnelly,[4] referring to Gonzalez and the other Spanish-speaking employee, said to two other SEPCO employees: "I don't pay attention to them.  They are second class citizens." She reported the incident to Dodson, who instructed all of the employees involved to apologize to Gonzalez.  Gonzalez received an apology from all employees involved.

---

[3]    It appears that most, if not all, of the other sales representatives were male.

[4]    There is no evidence as to what Donnelly's position at SEPCO was, but plaintiff does not allege that he was a supervisor.

The second incident also occurred prior to the relocation, when Gonzalez heard someone call her a "spic."  She does not know who said the word, but thinks it may have been one of SEPCO's outside sales representatives.  At the time she heard the remark, she did not know what "spic" meant, but her children explained to her that it was a derogatory reference to Hispanic persons.  She did not report the remark to SEPCO management, and she offers no evidence that any manager witnessed the event or knew of the comment.

On a third occasion, also prior to the relocation, a clerical employee of SEPCO, Estelle Blackmun, said to Gonzalez: "Why don't you [] go back to your country and leave us alone here.  We don't need you kind of people in this place."  Blackmun was not a supervisor at SEPCO.  Gonzalez did not report the comment to SEPCO management.  Gonzalez does not allege any incidents of discrimination based on her ethnic origin that occurred after SEPCO relocated in 1997 or 1998.

Gonzalez also complains of the following incidents that she alleges created a hostile environment based on gender.  Shortly after she began working at SEPCO in 1986, Gonzalez alleges that the accounting manager, Mike Turner, looked at her breasts. She did not work with Turner on a daily basis, and says his behavior did not

8

affect her work performance.   She complained to Mr. Wilder about Turner, and Mr. Wilder said he would take care of it.   Gonzalez alleges that she didn't get along with Turner, but says the reasons she and Turner didn't get along were reasons other than the alleged sexual harassment.   She claims that Turner continued to look at her breasts until he got married.[5]

Gonzalez complains that at some time within the first few years after she began working at SEPCO, Danny Deshazo made advances toward her, and once asked her to spend the weekend with him.   She complained to Mr. Wilder, who said he "would handle" the matter. Gonzalez also testified that at some time before the relocation in 1997 or 1998, Deshazo gave Gonzalez a kiss, which he called a "Christmas kiss."   She slapped him, but apparently did not complain to anyone in management at SEPCO about the kissing incident.

Gonzalez also complains that on one occasion after Falls had a problem with a female employee, Falls stated that he didn't "like to work with women."   Gonzalez overheard Falls make the statement, and he said to her: "I'm sorry, Norka, but it's the truth."

Gonzalez also testified that at some time before the relocation, Ross Friend, a male sales representative, "grabbed" her

---

[5]      Gonzalez stated that she cannot remember when he got married, and doesn't even recall whether he got married at a time closer to 1990 or 1999.

9

when she was working late one evening.  Gonzalez screamed into the paging system and an employee from downstairs came to her, which stopped Friend's conduct.  Gonzalez did not report the incident because she was "embarrassed."  Ross continued to act "too friendly" toward her, but she did not report his behavior.

On October 15, 1998, when none of the supervisors was in the office, Gonzalez overheard other employees laughing and telling a joke about a "pussycat," and then dividing the word "pussycat" into two words.  She complained to Dodson, who told her that "she did not have to put up with things like this," and that he would do something about it.  On October 19, 1998, Gonzalez sent an e-mail message to Falls relating the October 15 incident and complaining that Dodson had done nothing.  About two weeks later, an attorney for SEPCO presented a seminar to SEPCO employees about sexual harassment.  About two weeks after the attorney's presentation, Mrs. Wilder and Dodson called a meeting in which Mrs. Wilder informed employees that sexually harassing behavior would not be tolerated, and that employees were not to "tell inappropriate jokes" and were to "treat each other with respect."  She further informed employees they would be "written up and terminated" if they engaged in such behavior.  Gonzalez alleges that the sexually-oriented jokes continued.  She specifically remembers only one

joke, however, which was about a virgin.  Gonzalez does not allege, however, that she reported the continued behavior to any supervisor.

A review of Gonzalez's working history with SEPCO indicates that Gonzalez was not particularly unhappy with her job until after Mr. Wilder died and after her request for a separate office was denied.  Throughout her employment, she complained about the noise level in the office.  For the most part, the noise issue was resolved by Mr. Wilder when he placed Gonzalez and her secretary in their own office.  After the move from Pelham in 1997 or 1998, Gonzalez was denied her request for a separate office, and she repeatedly complained about the noise.  On October 14, 1998, the day before she heard the "pussycat" joke, she complained in a memo to Mrs. Wilder about the noise level in the office, and again requested that she be given a separate office.  She did not complain of any incidents of sexual harassment or of harassment based on her ethnic origin.  In her deposition, Gonzalez stated that she would be willing to return to her job at SEPCO if she could have her own office.

In November 1998, Gonzalez announced her intention to quit her job, telling Mrs. Wilder and Jim Falls to "give me two weeks and I'm gone."  The remark followed immediately an incident in which

11

the receptionist failed to page Gonzalez for an overseas telephone call.

On January 12, 1999, Mrs. Wilder terminated Gonzalez. She told Gonzalez that she was terminating her because international sales had declined. Gonzalez agrees that international sales declined dramatically from 1997 to 1998. Mrs. Wilder explained that she had decided to stop seeking international sales because sales were low, and the company was losing money due to the decrease in sales and the poor payment history from customers in Central and South America. The decision to terminate Gonzalez was made by Mrs. Wilder, Falls, and Dodson.[6] Prior to Gonzalez's termination, SEPCO had never received any complaint regarding sexual harassment from any other employee.

On March 8, 1999, Gonzalez filed a charge of discrimination with the EEOC. She filed a second, identical charge on April 12, 1999. Gonzalez filed the complaint commencing this action on August 26, 1999. She alleges: (1) she was subjected to a hostile work environment in violation of Title VII and 28 U.S.C. § 1981 on

---

[6] Mrs. Wilder also testified that Turner, as accounting manager, provided them with sales figures upon which they relied in reaching that decision. There is no evidence that he had any input in the decision other than through providing the accounting data.

12

account of (a) her ethic origin and (b) her gender[7]; (2) SEPCO wrongfully terminated her in retaliation for voicing her opposition to the harassment; (3) SEPCO intentionally inflicted severe emotional distress upon her; and (4) SEPCO negligently supervised its male employees.

The defendants seek summary judgment on all of Gonzalez's claims, asserting that: (1) the Title VII and § 1981 claims are time-barred; (2) the conduct complained of does not rise to the level necessary to sustain a hostile environment claim based on either ethnic origin or gender; (3) the retaliation claim is due to be dismissed because SEPCO has given a reason for her termination and that reason has not been shown to be a pretext. As to Gonzalez's state law claims, SEPCO seeks summary judgment on the outrage claim on the basis that the conduct complained of does not rise to the level of egregiousness necessary to be actionable under Alabama law. SEPCO also seeks dismissal of the negligent supervision claim, asserting that Gonzalez has failed to state a *prima facie* case under Alabama law. Each claim will be examined in turn.

---

[7]    The defendant asserts that a gender discrimination claim is not actionable under § 1981, but is viable only as a claim brought pursuant to Title VII. While the assertion is correct, it is irrelevant for purposes of analyzing Gonzalez's sex discrimination claims.

13

### III. DISCUSSION

#### A.  Sexual Harassment and Ethnicity Claims

##### 1.  Timeliness

The defendants assert that Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged violation and that failure to timely file is fatal to a Title VII claim.  There is, however, an exception to the 180-day limitation for conduct that constitutes a continuing violation.  See, e.g., Roberts v. Gadsden Mem. Hosp., 835 F.2d 793 (11th Cir. 1998).  The issue, then, is whether the conduct complained of was part of a continuing pattern of harassment that continued into the 180-day limitations period.  The frequency of the conduct is one factor that is relevant to a determination of whether the conduct may constitute a continuing violation.


##### a.  Sexual Harassment

In this case, Gonzalez has testified that as recently as October 15, 1998, male employees told a joke involving a sexually suggestive term.  Viewing the evidence in the light most favorable to the plaintiff, there is at least a fact question whether the sexually harassing conduct constitutes a continuing violation, and the time bar does not preclude Gonzalez's claims based on gender.

14

Thus, defendant is not entitled to summary judgment on the assertion that the claims of sexual harassment are time-barred.

### b.  Ethnicity Claims

The only incidents about which Gonzalez complains occurred before SEPCO moved its office from Pelham.  Plaintiff's complaint was filed in August of 1999.  Although Gonzalez states that the move occurred in 1997, Mrs. Wilder has testified that the company relocated in September 1998.  Accordingly, the claims are barred under Title VII because her EEOC charge was not filed until more than 180 days after the last incident of discrimination on the basis of ethnic origin.  However, the ethnic origin claims also are set forth pursuant to § 1981.  Viewing the facts in the light most favorable to the plaintiff, these claims are not time-barred pursuant to § 1981 because they could have occurred less than two years before the complaint was filed.  See, e.g., Patterson v. Augat Wiring Systems, Inc., 944 F. Supp. 1509, 1518 (M.D. Ala. 1996)(holding that the claims for § 1981 discrimination are governed by the same statute of limitations as state law personal injury claims); see also Goodman v. Lukens Steel Co., 482 U.S. 656, 660, 107 S. Ct. 2617, 96 L. Ed. 2d 572 (1987).  In Alabama, the statute of limitations is two years.  See Ala. Code § 6-2-38(1).

15

Likewise, SEPCO is not entitled to summary judgment on the § 1981 ethnicity claim insofar as it contends that the claim is time-barred.

### 2. 'Severe or Pervasive.'

In order to sustain a Title VII claim for harassment sufficient to create a hostile work environment, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she has been subject to harassment based upon her gender or ethnicity; (3) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discrim-inatorily abusive working environment; and (5) there exists a basis for holding the employer liable. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). An employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee. Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998).

It is undisputed that Falls and Deshazo had supervisory authority over the plaintiff. The primary issue on which

16

defendant's motion turns is whether the conduct was sufficiently severe or pervasive as to constitute violations of federal law.

     a.  Sexual Harassment

The Eleventh Circuit Court of Appeals recently examined the "severe and pervasive" element of a Title VII sexual harassment claim in Gupta v. Florida Board of Regents, 2000 WL 633024 (11th Cir. May 17, 2000).   The court in Gupta went on to note that the requirement is critical to prevent the courts from turning ordinary socializing in the workplace into discriminatory conduct.   Id. Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing" as well as horseplay and intersexual flirtation.  Gupta, 2000 WL 633024 at *7.

Likewise, in Mendoza, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination
> clearly includes sexual harassment, Title VII is not a
> federal "civility code."  Oncale v. Sundowner Offshore
> Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140
> L. Ed. 2d 201 (1998) ("We have never held that workplace
> harassment, even harassment between men and women, is
> automatically discrimination because of sex merely
> because  the  words  used  have  sexual  content  or
> connotations."); Faragher v. City of Boca Raton, 524 U.S.
> 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("A
> recurring  point  in  these  opinions  is  that  'simple
> teasing,'  offhand  comments,  and  isolated  incidents
> (unless  extremely  serious)  will  not  amount  to

discriminatory changes in the 'terms and conditions of
employment.'" (internal citation omitted)); Meritor
[Savings Bank,FSB v. Vinson], 477 U.S. at 67, 106 S. Ct.
2399 ("Not all workplace conduct that may be described as
'harassment' affects a 'term, condition, or privilege' of
employment within the meaning of Title VII.").

Id. at 1245.

The defendant correctly asserts that the Supreme Court has
recognized that it is not enough for Gonzalez to show that her
workplace was offensive; rather, she must show that the SEPCO
office where she worked was so permeated with discriminatory
intimidation, ridicule, and insult that a reasonable person would
perceive the environment as hostile or abusive. See Meritor
Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91
L. Ed. 2d 49 (1986).

In determining if this critical element of a sexual harassment
claim has been met, the court must look to the frequency, severity,
and pervasiveness of the conduct complained of. Again, the court
of appeals has said:

> The objective component of this analysis is somewhat fact
> intensive. Nevertheless, the Supreme Court and this
> Court have identified the following four factors that
> should be considered in determining whether harassment
> objectively altered an employee's terms or conditions of
> employment: (1) the frequency of the conduct; (2) the
> severity of the conduct;(3) whether the conduct is
> physically threatening or humiliating, or a mere
> offensive utterance; and (4) whether the conduct

18

unreasonably interferes with the employee's job
performance. Allen v. Tyson Foods, 121 F.3d 642, 647
(11th Cir. 1997) (citing Harris, 510 U.S. at 23, 114 S.
Ct. 367). The courts should examine the conduct in
context, not as isolated acts, and determine under the
totality of the circumstances whether the harassing
conduct is sufficiently severe or pervasive to alter the
terms or conditions of the plaintiff's employment and
create a hostile or abusive working environment. Id.;
see Harris, 510 U.S. at 23, 114 S. Ct. 367; Henson, 682
F.2d at 904; Faragher, 118 S. Ct. at 2283 (citing Harris,
510 U.S. at 23, 114 S. Ct. 367, and explaining that "we
directed courts to determine whether an environment is
sufficiently hostile or abusive by 'looking at all the
circumstances'").

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

Moreover, it has been noted that Title VII may not be used as a

tool to punish "the ordinary tribulations of the workplace,"

Faragher, 524 U.S. at 788, or failure to treat a female employee

with "sensitivity, tact and delicacy," Minor v. Ivy Tech State

College, 174 F.3d 855, 858 (7th Cir. 1999). The court is not

permitted to police language in the workplace under the guise of

enforcing Title VII.

In this case, Gonzalez asserts that she was subjected to four

specific incidents of sexual harassment over the course of her 13-

year employment at SEPCO. Two of these incidents included physical

contact: being kissed by Danny DeShazo, and being "grabbed" by Ross

Friend. One of the incidents involved hearing a supervisor state

that he "didn't like to work with women;" another involved a man
who looked at Gonzalez's breasts.  In addition, Gonzalez complains
that Deshazo asked her to spend the weekend with him, and that she
overheard male sales representatives on several occasions telling
vulgar jokes.  As discussed *infra*, the court has examined the
totality of the circumstances and finds that the plaintiff has
failed to show that the conduct complained of rose to the level
that a reasonable person would have perceived as hostile and
abusive.

The crude jokes of which Gonzalez complains apparently were
not directed at plaintiff or other female employees for the purpose
of humiliating or intimidating them.  Some of the women in the
office laughed at the jokes.  Aside from the fact that the jokes
were told loudly, they did not interfere with the plaintiff's work
performance.  The evidence, viewed as a whole, indicates that some
SEPCO employees simply talked in a crude or vulgar manner, and
Gonzalez's desk was in such proximity that she could hear the
jokes.  The Eleventh Circuit Court of Appeals has noted that the
use of coarse or boorish language has been deemed "too commonplace"
in our society to be classified as discriminatory.  Gupta, 2000 WL
633024 at *9, citing Minor, 174 F.3d at 858.

The comment by Falls that he didn't like working with women must be construed as an "offhand" comment that likewise should not be construed as discriminatory. It was not directed at plaintiff and apparently was made at a moment when Falls was annoyed with another female employee. In addition, the court notes that Falls was one of the persons responsible for Gonzalez's hiring, and that, if he had wished to discriminate by refusing to work with women, he could have rejected her application.

The incidents involving physical contact are more troubling. Even so, the physical contact occurred on two isolated occasions, and did not involve anyone in supervisory authority over Gonzalez. Gonzalez does not allege that she was subjected to any touching or unwanted contact on a regular or frequent basis.

Furthermore, there is little or no evidence that the conduct complained of so altered the work environment that it "unreasonably interfered with the employee's job performance." Id. This factor requires a showing of both subjective and objective interference with the job performance. Id. Gonzalez does not make any substantial showing that the offensive conduct interfered with her work. She maintains, and the record indicates, that Gonzalez performed her job acceptably until 1998, long after most of the conduct occurred, when sales began to decline. Even then, Gonzalez

21

does not allege that the harassment in any way affected her ability to do her job.  She has said she felt "embarrassed" by contact and clearly was offended; however, she does not allege that she was unable to perform her job duties as a result of the harassment.

As stated in Gupta, this court has a duty to examine the defendant's conduct to determine whether it meets the "sufficiently severe or pervasive" requirement.  Taking the plaintiff's allegations as true, and viewing the totality of the circumstances, the court finds that the alleged harassment in this case is simply not conduct that a reasonable person would view as so severe or pervasive as to alter Gonzalez's working conditions and warrant redress.  Consequently, the defendant's motion for summary judgment is due to be granted as to plaintiff's Title VII claims based on gender.

b.  Ethnicity

In plaintiff's response to the motion for summary judgment, there is no mention of any claims of discrimination based on Gonzalez's ethnic origin.  Even so, the plaintiff does not explicitly concede those claims.  Upon examination of the evidence presented in support of the motion, however, the court finds that Gonzalez mentions only three incidents in any way related to her

22

Hispanic background.  The three incidents included only derogatory comments and did not include any intimidating or harassing conduct other than verbal remarks.  None was made by a supervisor, and none affected plaintiff's work performance.  The first incident, in which she was referred to as a "second-class citizen," prompted her to complain to management.  In response, all employees involved in the alleged harassment were directed to apologize to Gonzalez, and they did so.  In spite of Godson's prompt action in addressing and remedying the first incident, Gonzalaz did not report to any manager the subsequent incidents about which she now complains. The three incidents must be viewed as isolated, sporadic, or offhand comments that, while rude, are not actionable. Accordingly, the claims, even if not conceded, are due to be dismissed because the incidents were not sufficiently "severe or pervasive" as to constitute a violation of federal law.


**B.  Retaliatory Discharge**

Even if the plaintiff had succeeded in establishing a *prima facie* case of discrimination on the basis of sex or ethnicity, the presumption of discrimination may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the employer meets its burden of articulating a non-

23

discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Because the defendant has offered a nondiscriminatory reason for the termination -- that international sales declined steeply and the company made a business decision not to pursue additional international sales because of the global economy and poor payment histories of some international clients -- to overcome the motion for summary judgment Gonzalez must demonstrate by competent, admissible evidence that the defendant's nondiscriminatory reason is merely a pretext for retaliation against her.  She must show not only that the articulated reason is false, but also that the defendants' true reason for the termination was retaliation.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). It is not the duty of this court to evaluate whether the decision to terminate Gonzalez was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not

violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

No fact in evidence logically calls into question the credibility of the articulated nondiscriminatory reason.  Without recounting all that evidence, it suffices to recall that Mrs. Wilder consistently stated that the reason for the termination was the decline in sales, and that Gonzalez admits that international sales, which were solely her responsibility, had steeply declined in the year before she was terminated.  This reason is bolstered by the plaintiff's own testimony and by other evidence that shows that SEPCO stopped advertising in trade journals, signaling its business decision to stop seeking international sales.

The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury."  Combs, 106 F.3d at 1526.  The court finds no substantive support for Gonzalez's argument that the reason given for the termination was a pretext.  All of the specific evidence indicates that the termination was made due to concerns wholly separate from Gonzalez's complaints.

Consequently, the court finds that Gonzalez has failed to meet her secondary burden of showing that SEPCO's stated reason for her

termination was pretextual, and Gonzalez's claim of retaliation is subject to summary judgment in favor of the defendant.


### C. Outrage

Plaintiff concedes that SEPCO's motion for summary judgment on Gonzalez's outrage claim is due to be granted.


### D. Negligent Supervision

Under Alabama law, a negligent supervision claim requires a showing that the employee accused of the misconduct was "incompetent" and that the employer actually knew or should have known of the incompetence.   See, e.g., Lane v. Central Bank of Alabama, 425 So. 2d 1098 (Ala. 1983).   The Alabama Supreme Court has stated:

> It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.

Armstrong Business Services, Inc. v. AmSouth Bank, 2001 WL 996066 * 16, No. 1992302 (Ala. Aug. 31, 2001), quoting Big B, Inc. v. Cottingham, 634 So. 2d 999, 1003 (Ala. 1993).

In the instant case, Gonzalez reported only the following conduct: Deshazo's behavior in asking her to spend the weekend, Turner's looking at her breasts, Donnelly's reference to her as a "second-class citizen," and the conduct of nameless male employees who made the "pussycat" joke.  These incidents occurred over a span of 13 years.  She did not report Ross Friend's advances, Deshazo's kiss, or any of the other jokes she alleges were frequent.  The conduct at issue is simply not of the nature, character, and frequency contemplated by the state courts as actionable. Furthermore, there is insufficient evidence to show that any employee's conduct was of the nature, character, or frequency that SEPCO knew that any male employee's conduct rendered him "incompetent," triggering any duty.

Finally, where the discrimination claim fails, so must the derivative negligent supervision claim.  See Levesque v. Regional Med. Ctr. Bd., 612 So. 2d 445, 449 n.10 (Ala. 1993).

## IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the motion for summary judgment, this court determines that there are no genuine issues of material fact and that defendant is

entitled to judgment as a matter of law. Defendant's motion for
summary judgment against plaintiff is due to be granted as to
plaintiff's Title VII claims of sexual harassment and retaliatory
discharge, her Title VII and § 1981 claims of discrimination based
on ethnic origin, and her state law claims of outrage and negligent
supervision. Consequently, the motion for summary judgment is due
to be granted, and all of plaintiff's claims are due to be
dismissed with prejudice.

A separate order will be entered in accordance with the
findings set forth herein.

Dated the 8th day of April, 2002.


T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

28